TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00401-CR






Gordon Lee Currin, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT

NO. CR22,329, HONORABLE ED MAGRE, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Gordon Lee Currin was convicted of murdering Greg Storey. (1) See Tex. Penal Code
Ann. § 19.02 (West 2003) (listing elements for murder). During the trial, Currin pleaded not guilty,
but the jury found him guilty and imposed a life sentence. On appeal, Currin challenges the district
court's decision to exclude evidence regarding violent acts allegedly committed by Greg. We will
affirm the judgment of the district court. 


BACKGROUND

 Three years before his death, Greg purchased property from Currin and
agreed to make monthly payments directly to Currin. Greg lived on that property with his wife,
Tammy Storey. In addition to the Storeys' home, there was another building located on the property,
which Greg had at one time rented out to John and Deborah Alexander. While they leased the
property, the Alexanders ran a barbecue restaurant inside the building. However, shortly before
Greg's murder, Greg evicted the Alexanders from the property. 

 Currin and Greg had an amicable relationship until Currin indicated that he wanted
to discontinue their financial arrangement and wanted to sell either the property or the note on the
property to someone else. (2) As the relationship deteriorated, Greg and Currin each contacted law-enforcement officials regarding threats allegedly made by the other. Several officials advised both
Currin and Greg to stay away from one another. 

 Shortly after having a discussion with the police, Currin saw Greg sitting outside in
front of the building that the Alexanders had used as a barbecue restaurant. At the time, Currin was
riding in his truck with his friend, Rosalee Jones. As Currin drove by, he and Greg exchanged
obscene gestures. After exchanging gestures with Greg, Currin then proceeded to Jones's home and
dropped her off. Once Jones got out of the truck, Currin retrieved his shotgun from behind the seat,
put the gun in the front of the car, and proceeded to Greg's property again. While driving by Greg's
home for the second time, Currin and Greg again exchanged obscene gestures. In addition, Greg also
yelled something at Currin. Around this time, Greg told his wife to go to their home and call the
police. Eventually, Currin turned onto Greg's property and parked in a lot in front of the restaurant.

 After Currin parked his truck, Greg moved quickly towards the truck. When he saw 
Greg moving towards the truck, Currin pulled his gun from the front floorboard and showed the gun
to Greg. Once Greg saw the gun, he yelled, "gun," and then turned and ran back towards the
building. As Greg was running away, Currin shot him in the back three times. 

 When Tammy heard the shots, she ran back to the restaurant and found her husband
lying on the ground. She also saw Currin's truck leaving the parking lot. After shooting Greg,
Currin drove to the sheriff's office and told an officer that he "just shot a fella," "shot the
motherfucker," or "shot the son of a bitch."

 Shortly after his arrival at the sheriff's station, Currin was arrested and questioned
regarding the shooting. During the questioning, Currin stated that he shot Greg in self-defense and
that Greg must have been running to get a weapon. The police searched the area where Greg's body
was found, but they found no weapons in the area. Ultimately, a trial was held, and the jury found
Currin guilty of murdering Greg and imposed a life sentence. 


DISCUSSION

 In one issue on appeal, Currin asserts that the district court abused its discretion by
refusing to allow Currin to present evidence regarding violent acts allegedly committed by Greg prior
to the shooting. See Tate v. State, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998) ("Tate I")
(explaining that appellate courts review decision to exclude evidence for abuse of discretion). 
Specifically, Currin insists that the district court erred by preventing him from introducing evidence
showing that Greg had threatened the Alexanders. After the court concluded that John and Deborah
could not testify regarding threats Greg allegedly made against them, Currin made an offer of proof
in which the Alexanders testified outside the presence of the jury regarding the events. The
Alexanders both stated that a few weeks before Greg was killed, he came to their restaurant,
threatened them, and showed them a gun that he had under his shirt. Further, the Alexanders related
that during the time of the eviction proceedings, Greg went to the restaurant again and told them that
he would burn their house down and shoot them when they ran out of the house. On appeal, Currin
insists that the district court's decision harmed him because it "denied him the opportunity to
discredit the testimony by the State concerning the lack of weapons available to [Greg], as well as
the opportunity to bolster [his] contention that he reasonably thought [Greg] was going for a weapon
when he turned from the truck and ran towards the building." (3) 

 In general, evidence regarding a victim's character is not admissible "for the purpose
of proving action in conformity therewith." Tex. R. Evid. 404(a). Similarly, evidence of other
crimes or bad acts committed by a victim is not admissible simply to show character conformity. 
Id. R. 404(b); see Torres v. State, 117 S.W.3d 891, 895 (Tex. Crim. App. 2003). However, these
general rules have several exceptions, including admitting evidence of a "pertinent character trait of
the victim." Id.; see Tate I, 981 S.W.2d at 192. For murder cases, if a defendant raises the issue of
self-defense, the defendant may "introduce evidence of the deceased's violent character" in order to
demonstrate "the reasonableness of the defendant's fear of danger or to demonstrate that the
deceased was the first aggressor." Torres, 117 S.W.3d at 895; see Tate I, 981 S.W.2d at 193
(explaining that rules of evidence allow for admission of evidence of prior bad acts for certain
purposes). Evidence pertaining to whether the deceased was the first aggressor is admissible because
it relates to "the deceased's intent, motive, or state of mind." Torres, 117 S.W.3d at 895; see Tex. R.
Evid. 404(b) (allowing evidence of violent acts by victim to be introduced as proof of motive, intent,
plan, and other reasons). Because evidence addressing whether the victim was the first aggressor
goes to the victim's state of mind, it is not necessary that the defendant know of the violent act or
acts. Torres, 117 S.W.3d at 895. Before evidence of violent acts by the victim may properly be
introduced, the defendant must show "some act of aggression that tends to raise the issue of self-defense, which the violent act may then help clarify." See id. 

 When arguing that the district court erred by excluding the evidence, Currin insists
that a proper predicate had been laid prior to the Alexanders being called to testify. Specifically,
Currin refers to testimony from several witnesses, including himself, describing various threats Greg
allegedly made and to the portion of his testimony where he stated that Greg moved aggressively
towards his truck before the shooting. 

 Even assuming that the district court erred by excluding the evidence sought, that
error would not be grounds for reversal in this case. For criminal cases, there are two types of
reversible errors: (1) constitutional errors, and (2) nonconstitutional errors that affect a substantial
right. See Tex. R. App. P. 44.2. Incorrect evidentiary rulings only rarely rise to the level of
constitutional error. Williams v. State, 191 S.W.3d 242, 257 (Tex. App.--Austin 2006, no pet.); see
also Tex. R. App. P. 44.2(a) (outlining review of constitutional errors). The exclusion of defensive
evidence is constitutional error only if the "evidence forms such a vital portion of the case that
exclusion effectively precluded the defendant from presenting a defense." Williams, 191 S.W.3d at
257; see Potier v. State, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002). In other words, if the
defendant was not prevented from presenting the substance of his defense, the erroneous exclusion
of evidence was not of a constitutional nature. Potier, 68 S.W.3d at 666. 

 No unconstitutional deprivation occurred in this case. Although Currin was not
allowed to question the Alexanders in front of the jury regarding threats Greg allegedly made against
them, Currin was able to present his defense. The jury was properly instructed regarding the law of
self-defense and was told to acquit Currin if they determined that Currin "reasonably believed that
the use of deadly force on his part was necessary to protect himself against . . . [Greg's] use or
attempted use of unlawful deadly force." See Tex. Penal Code Ann. § 9.32(a)(2)(A) (West Supp.
2009) (listing circumstances in which use of deadly force is authorized). In his testimony, Currin
also insisted that he never threatened Greg. Further, Currin asserted that he placed the gun in the
front seat because he was going hunting later and that he only went to Greg's property to collect
money from him. 

 Regarding the shooting, Currin claimed that Greg threatened to beat him when he
drove by the property and that he only shot Greg after first hearing a gun shot. During the trial,
Currin insisted that the shot was fired by a "sniper" from across the street. In addition, Currin
testified that Greg aggressively advanced towards his truck before he pulled out the gun. 
Furthermore, Currin communicated his belief that Greg "had to be" or "might have been" going to
get a gun when Greg ran back to the building. 

 In addition to Currin, several witnesses testified that they heard more than three
gunshots. For example, John testified that he was in the general area when the shooting occurred
and that he heard four shots. John also explained that one of the shots sounded different than the
others, but he admitted that he did not tell the police about the fourth shot when they questioned him. 
Deborah agreed with her husband's testimony and stated that she heard four shots but that the first
one was louder than the others. Similarly, Melissa Jackson testified that she lives about a block from
where the shooting occurred and that she heard the shots. However, when she described the shots,
she stated that she initially heard "a small pop like it was either a small pistol or a firecracker, and
then three loud booms." (4) Jackson admitted that she never told the police what she had heard. 

 Moreover, although the Alexanders did not testify in front of a jury about threats Greg
allegedly made against them, other witnesses provided general testimony regarding the alleged
threats. For example, Deputy Chris White testified that he had been called to the Storeys' property
on more than one occasion due to disagreements between Greg and the Alexanders and agreed that
the parties had threatened each other. Similarly, Constable Herbie Vaughan testified that he had
witnessed a confrontation between Greg and the Alexanders. 

 In addition to testimony pertaining to these alleged threats, testimony was also
presented describing other threatening behavior allegedly engaged in by Greg. For example,
Deputy White testified that Currin and Greg had both threatened one another. Also, Currin's
daughter, Diane Whiteley, testified that Currin had been preoccupied by "threats [Greg] was making
against him." Officer Johnny Beathard testified that he had known Greg for years and admitted that
Greg had a temper. Similarly, Sheriff David Greene stated that Greg has a reputation for being
violent. Finally, Hollis Lewis, who was a former district attorney, and Delmon Cude, who was an
inmate at the time of the trial, testified that Greg had a reputation for not being a peaceful person,
that Greg was a bully, and that Greg was not a law-abiding citizen. 

 Beyond this general testimony, Currin testified regarding specific threats Greg
allegedly made against him prior to the day of the shooting. In his testimony, Currin recalled that
Greg had threatened to beat him "into the ground," to "whoop" him, to shoot him, and to burn his
house down. (5) In addition, Currin related that Greg once went to Currin's house with a "little old
pistol" and that Tammy and Greg had threatened his life. Further, Currin testified that right after
Greg threatened his life, he invited Greg to go hunting with him. When describing the hunting trip,
Currin stated that he gave Greg a gun to use and that Greg later pointed the weapon at him
and cocked the gun. 

 In light of the preceding, we cannot conclude that Currin was prevented from
presenting the substance of his self-defense claims. Accordingly, assuming that the exclusion was
erroneous, the error is nonconstitutional in nature and, therefore, must be disregarded unless it
affected one of Currin's substantial rights. See Tex. R. App. P. 44.2(b); see also Tate v. State,
988 S.W.2d 887, 890 (Tex. App.--Austin 1999, pet. ref'd) ("Tate II") (explaining that ruling that
results in "the erroneous exclusion of defensive evidence is nonconstitutional error if the trial court's
ruling merely offends the rules of evidence"). "A substantial right is affected when the error had a
substantial and injurious effect or influence in determining the jury's verdict." Tate II, 988 S.W.2d
at 890. In other words, the conviction should not be overturned if the reviewing court, "after
examining the record as a whole, has fair assurance that the error did not influence the jury, or had
but a slight effect." Id.

 Even assuming that the jury would have believed the testimony from the Alexanders
and assuming that their testimony would have supported Currin's self-defense claim, the exclusion
of that evidence did not affect Currin's substantial rights. As described above, the jury was properly
instructed on the law of self-defense, and Currin was able to elicit testimony from various witnesses
regarding threatening behavior allegedly committed by Greg prior to the shooting. Furthermore, the
evidence presented at trial demonstrated that Currin drove by Greg's property, exchanged offensive
hand gestures with Greg, moved his gun from his back seat to his front seat before driving back to
Greg's property, exchanged obscene gestures with Greg again, parked on Greg's property, flashed
his gun, shot Greg in the back three times when Greg attempted to run away from the gun, drove to
the police station, and told the police that he had shot Greg. In his testimony, Currin also stated that
he would not tolerate anyone yelling at him. In addition, Currin explained that his gun would have
continued to shoot additional rounds if it had not jammed. 

 Moreover, evidence was also introduced showing that Currin had threatened to kill
Greg shortly before Greg was shot. Specifically, Jones testified that on the day Greg died, she heard
Currin tell John over the phone that "either you're going to get [Greg] or I'm going to get him;
somebody is going to kill him." (6) In addition, Tammy testified that Currin told her that the only
reason Greg was still alive was because Greg had a wife and children to take care of. During his
testimony, Officer Beathard explained that a few days before the shooting, Currin asked, "what can
I do, shoot [Greg]?" 

 In addition, although Currin testified that Greg may have been going for a gun, no
evidence was introduced showing that Greg was armed or attempted to use deadly force. In fact,
when the police searched the area in response to Currin's assertion that he thought Greg may have
been going for a weapon, the police found no weapons in the area near where the shooting occurred. 
Further, the three shot gun casings that were recovered from the scene and from Currin's truck had
all been fired from Currin's gun. 

 Regarding the alleged sniper, none of the witnesses that were in the area when the
shooting occurred or that responded to the scene reported seeing a sniper. Moreover, Currin
admitted that he did not know who the sniper was shooting at. Also, although the Alexanders and
Jackson testified that they heard four shots, Tammy testified that she only heard three shots. 
Similarly, Jennifer Juhl, who was driving by the Storeys' property when the shooting occurred,
testified that she heard three shots fired. 

 Furthermore, when Currin drove to the sheriff's office and admitted that he shot Greg,
he did not mention a sniper. (7) Instead, Currin stated that he drove to Greg's property to see what Greg
had been yelling and that he blew Greg's "ass away" when Greg tried "to run in the house." During
that same session with the police, he later stated that he shot Greg "flat as hell that's what I did." 
Currin's statement to the police was played to the jury. In addition to that recording, the State also
played a recording of a conversation Currin had with Jones while he was at the police station. 
During that telephone exchange, Jones told Currin, "I heard you killed [Greg]," and Currin
responded, "Well he knew he was going to get it." 

 The absence of any evidence showing that Greg used or was about to use deadly force
against Currin prior to Currin displaying his gun and shooting Greg persuades us that any error that
the district court may have committed by excluding the evidence in question did not have a
substantial and injurious effect or influence on the jury's verdict. In light of the evidence in the
record, we have more than a fair assurance that the error did not influence the jury or had but a slight
effect. Accordingly, we conclude that any error did not affect a substantial right and overrule
Currin's issue on appeal. 

 

CONCLUSION

 Having overruled Currin's sole issue on appeal, we affirm the judgment of the
district court. 


 

 David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed 

Filed: August 27, 2010

Do Not Publish



1. Due to the fact that several of the people involved in this case share identical last names,
we will refer to those individuals by their first names. 
2. One witness testified that Currin was planning on selling the property to the Alexanders. 
3. We note that no evidence was introduced showing that Currin was aware of the threats
allegedly made against the Alexanders prior to the shooting. 
4. Jackson testified that she has known Currin for over twelve years and has purchased eleven
properties from him over the years. 
5. In his testimony, Currin stated that the threats did not bother him and that he was not scared
of Greg. 
6. In their testimonies, John and Currin both denied that this exchange occurred. 
7. In his statement, Currin did assert that he thought Greg was running from the truck to get
a gun.